LOUIS LEWIS, Appellant, *v.* HENRY PETERSEN et al., Respondents.

Vendor and purchaser — contract — sale — terms of sale by which purchaser assumed payment of taxes and assessments levied after sale — meaning of words " taxes and assessments levied "— vendor obliged to pay assessment where everything required by law to make the levy had been done before sale and nothing remained but to collect amount.

Where by the terms of an auction sale of real property, situated in the city of Long Beach, it was provided that the purchaser assumes the payment of " all taxes and assessments levied on said property from the date of the auction sale," and, where it appears that prior to said sale, pursuant to the charter of said city, everything had been done required by law to levy and impose an assessment for local improvements upon property sold, and that nothing was left to be done except to collect the amount, the vendor and not the purchaser is obliged to pay said assessment. The words " levied and imposed " applied to the completion of the assessment when the tax rolls were delivered to the city clerk and not to the delivery of the tax roll with the warrant for collection to the city treasurer. Upon refusal, therefore, of the vendor to pay the assessments at the time for closing, the purchaser may successfully maintain an action to recover his deposits. (*Matter of Babcock*, 115 N. Y. 450; *Hall* v. *Hess*, 232 N. Y. 472, followed; *Coudert* v. *Huerstel*, 60 App. Div. 83; *Ogden* v. *Getty*, 100 App. Div. 430, distinguished.)

*Lewis* v. *Petersen*, 210 App. Div. 750, reversed.

(Argued October 28, 1925; decided November 24, 1925.)

APPEAL from a judgment, entered December 1, 1924, upon an order of the Appellate Division of the Supreme Court in the second judicial department, reversing a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term and directing a dismissal of the complaint.

*Ira Skutch* and *Wilbur C. Davidson* for appellant. The assessments in the amount of $759.20 were levied and imposed against the premises on August 1, 1922. (*Matter of Babcock*, 115 N. Y. 450.)

*David Michelsohn, John M. Detjen* and *Milton Dammann* for respondents.   The assessments were not levied and imposed on the property until November 15, 1922, after the date of the auction sale.   (*Wall* v. *Hess*, 232 N. Y. 472; *Ogden* v. *Getty*, 100 App. Div. 430; *Coudert* v. *Hurstel*, 60 App. Div. 83; *Apex Leasing Co.* v. *White Enamel*, 202 App. Div. 354; *Doonan* v. *Killilea*, 222 N. Y. 392; *Real Estate Corp.* v. *Harper*, 174 N. Y. 123.)

CRANE, J.   This litigation arises out of the purchase of ten lots by the plaintiff at an auction sale held on September 2, 1922.   The property offered for sale consisted of a large number of lots at Long Beach, auctioned by Joseph P. Day, Inc., under printed terms of sale. The plaintiff purchased lots Nos. 6 to 10, and 46 to 50 of block 38, for the sum of $13,750, and paid 10 per cent at the time, together with the auctioneer's fees; and the second installment on October 9, 1922, of 10 per cent, making a total payment of $2,900, for the recovery of which this action is brought.

The terms of sale, or contract, under which the plaintiff's purchase was made is apparently a very carefully prepared paper, as it contains many conditions, and takes up seventeen pages of the printed record.   Only two paragraphs, however, concern this case.   They read as follows:

### " TERMS OF SALE

" The premises shown on the map distributed at the Auction Sale will be sold by various owners by lots as shown on said maps.

" The sale will be governed by the following terms and conditions:

" *First.*   *   *   *   Ten per cent on October 2nd, 1922, and the balance in payments of 2 per cent. monthly on the purchase price herein, said monthly payments to commence on November 1st, 1922, and to be paid on the first day of each and every month thereafter until

said principal sum, together with interest on the unpaid balances of the purchase price from the date hereof, at the rate of 6 per cent. per annum, payable semi-annually on the first day of June and December, shall have been paid by the purchaser. The purchaser assumes payment of all taxes and assessments levied on said property from the date of the auction sale. * * *

" *Seventh.* Policies of Title Insurance will be issued free to the purchasers by the Title Guarantee & Trust Company, free from incumbrances excepting the covenants and incumbrances hereinafter mentioned, and taxes and assessments levied and imposed on the property subsequent to the date of the auction sale."

Twice, therefore, in this agreement, do we find the condition that the purchaser assumes the payment of " all taxes and assessments levied on said property from the date of the auction sale."

The date of the auction sale, as before stated, was September 2, 1922, which is a pivotal date in this case.

At the closing of the title it was found that there had been an assessment for local improvements levied on the property in the amount of $759.20, prior to September 2, 1922, which the plaintiff refused to pay. His contract required him to pay assessments levied after September second, and not those levied and assessed prior to that date. The vendors, however, through the title company, insisted that the plaintiff was obliged to meet the assessments, for the reason that although levied and assessed prior to September 2, 1922, they were not collectible until after that date. The title was not closed, both sides adhering firmly to the position taken. Thereupon the plaintiff commenced this action to recover his deposits, as above stated, and while he succeeded at the Special Term, his complaint has been dismissed by the Appellate Division.

What was meant by the words " taxes and assessments levied? " By paragraph 7, the title is to be " free from

incumbrances excepting the covenants and incumbrances hereinafter mentioned." The assessment here in question was not an incumbrance thereafter mentioned in the agreement. Another exception, beside "the incumbrances hereinafter mentioned" was contained in this clause. Taxes and assessments levied and imposed after September 2, 1922, were also excepted. The reverse must, therefore, be true. The taxes levied and assessed before that date were not excepted. The title was to be free from these; that is, the owner, and not the purchaser, was to pay them. What, therefore, was meant by these words, "levied and assessed?" Did they mean taxes which had become an incumbrance and a lien, or did they mean assessments which had been levied and imposed, although not yet due and payable, or not yet a lien upon the property? We may expect from an agreement as carefully drawn as these terms of sale by such a well-known auctioneer, that legal terms were used with their precise and actual meaning.

This was the view taken by counsel on the trial. The court said: " It is only a question when the assessments were levied.

" Mr. Dammann (defendant's counsel): That is all. * * * And that the only question for the Court to decide is whether the amount of assessment set forth in your complaint constituted a levy and an imposition under the contract on the date of sale.

" Mr. Wolbarst (plaintiff's counsel): I except to levy and imposition; the only question being whether the assessments were levied and imposed following the language of the contract.

" Mr. Dammann: I accept the substitution."

The charter of the city of Long Beach is found in chapter 635 of the Laws of 1922, and contains the procedure for levying and collecting assessments. All legislative powers are vested in the city council, which is given authority by section 79 to borrow money and

to issue bonds for municipal purposes. " All assessment bonds shall mature within ten years and shall be in anticipation of the collection of assessments levied or to be levied for local improvements." The collection of an assessment is a different act from levying the assessment.

The charter further provides:

" Sect. 81-a. *Pavements; council may direct construction.* The council may, by ordinance, direct and require any street or public ground in said city, or any part of either of them, to be graded, paved or macadamized, or to be regraded, repaved or resurfaced, or otherwise improved or repaired, at the cost and expense of the owners of the lots or parcels of land adjacent to the street, or public ground, or part thereof, so graded, paved, macadamized, repaved or resurfaced, improved or repaired and of the public at large, which cost and expense shall be apportioned, assessed and collected as hereinafter provided.

" Sect. 81-b. *Ordinance and notice to be published; hearing; action thereon.* The council shall cause the proposed ordinance for an improvement specified in the last preceding section to be published once a week for at least two successive weeks in the official newspaper with a notice that at the time and place to be stated therein, which shall not be less than fifteen days from the first publication thereof, it will meet to consider such ordinance, and that at such meeting all parties interested may be heard. The council at the time and place stated in such notice, or at such other time and place as shall then be appointed for such purpose, shall hear all parties interested in the matter of such ordinance who shall desire to be heard, and by a majority of the members then present may adopt, modify or reject such proposed ordinance."

By section 120 an assessment for local improvements shall be made to resemble in form, as nearly as practicable, the general tax list, and all provisions relating to the

collection of taxes are made applicable to the collection of assessments.

The yearly taxes raised for general purposes are based upon assessment rolls, which when completed are filed with the city clerk. On or before the first day of December the city clerk delivers a certified copy of the roll with the taxes extended thereon to the city treasurer, with the warrant annexed, signed by the mayor and the city clerk, commanding him to receive and collect the several sums assessed against the persons or property mentioned. All taxes assessed and levied upon real estate in the city of Long Beach are a lien on the first day of December following. (Sections 104 and 107.) The collection of assessments is to follow as far as practicable this procedure for the collection of the general yearly tax. There is this difference, however: The whole city constitutes a tax district, and the board of assessors consists of three persons who have a right to review the assessment of property for taxation after the roll has been filed with the city clerk. This procedure does not apply to assessments for local improvements. For these, the city council makes the assessment on the property declared by it to be benefited so that after the hearing by the city council, as provided by section 81-b, and the delivery of the assessment roll to the city clerk, the assessments become final.

In the case before us we have these facts: On June 9, 1922, at a meeting of the common council, an ordinance was passed for grading and paving certain named streets at the cost and expense of the owners of the lots and parcels adjacent thereto. At the same time another ordinance was passed for the construction of a sewer in streets named, at the expense of the owners of the land and parcels benefited thereby. On June twenty-seventh the city council adopted a resolution relating to the cost of these improvements, reading in part as follows:

" * * * the Council shall make and file in the office of the City Clerk an apportionment of such cost and expense of the portion thereof to be assessed thereon, upon such lots or parcels of land and shall cause a notice thereof and that at a specified time and place a hearing will be had to consider and review the same to be published once a week for at least two successive weeks in the official newspaper. * * * The Council shall meet at the time and place specified and hear objections of such apportionment. It may modify and correct the same, and exclude land from the area of local assessment. Upon the completion of such apportionment the Council shall file the same with the City Clerk."

On August 1, 1922, the day set for hearing, the city council took action as follows: "A hearing was called on the apportionment of assessment and map and plan of proposed area of assessment pursuant to notice in proceedings for construction of the sewerage system in the city of Long Beach (also for grading and paving of streets)." Then follows a description of the lots and the amount of the assessment levied on each lot for the sewer and for the grading improvements.

The property purchased by the plaintiff and the assessments objected to were included in this action by the common council.

On the first day of August, 1922, we, therefore, find that pursuant to the charter of Long Beach, everything had been done required by law to levy and impose an assessment upon the plaintiff's property for local taxation. Nothing was left to be done except to collect the amount. The city council had determined the cost of the improvement, had apportioned the expense among the various lots affected, and had filed the assessment roll with the city clerk. The minutes of the hearing on August first conclude with this statement: " Resolved that the amount so apportioned be assessed accordingly."

The next step taken was on November 15, 1922, when

the city clerk certified the assessment roll to the treasurer for collection.

It seems quite clear to us, therefore, that on September 1, 1922, there had been levied and imposed upon the plaintiff's property within the wording of the sales agreement, assessments for local improvements, and that the owner, and not the plaintiff, was obliged to pay them.

Previous cases support our views about this contract. In *Matter of Babcock* (115 N. Y. 450) one Detmold died on July 2, 1887, owning real estate liable to taxation. Previous to his death his real estate had been assessed to him for the taxes of 1887 and the assessment rolls had been delivered to the aldermen for the ascertainment of the amount of the tax and its extension by them upon such rolls. It was claimed that the taxes were improperly inventoried by the executors as liabilities of the estate. The tax laws applicable provided that the assessment rolls were to be delivered to the aldermen of the city on the first Monday of July, who were thereafter to extend on the rolls the amount of the taxes respectively chargeable upon the property to the persons described. When the assessment rolls were finally completed by the extension of the tax thereon, the aldermen were required, on or before the first Monday of September, to deliver them to the receiver of taxes with their warrant for collection. The testator died on July 2, 1887, after the delivery of the assessment rolls to the aldermen, and before delivery to the receiver for collection. This court said:

" It would seem, therefore, that the testator's property had been legally assessed to him, and his liability for the payment of the tax thereon had become irrevocably fixed prior to the date of his death. We think the question in this case is controlled by the decision of this court in *Rundell* v. *Lakey* (40 N. Y. 513). In that case the defendants sold and conveyed to the plaintiff a farm on the first day of September. Previous to that time it had been assessed by the town officers to the defendants and

the assessment-roll had been delivered to the supervisors in accordance with the statute. The amount of the taxes thereon was not ascertained and extended on the roll by the supervisors until November thereafter. The decision of the case depended upon the construction of a contract between them, which provided that the person legally liable to the payment of the tax should pay it. It was held that the vendors were so liable by reason of their ownership of the property at the time the assessment was made." The court held that the liability for such tax is conclusively fixed by the completion and delivery of the roll.

A similar question arose regarding the terms of a lease in *Wall* v. *Hess* (232 N. Y. 472). The lease provided that the tenant shall " pay and discharge when due and payable or within sixty days thereafter, all and every tax and taxes, * * * which shall be assessed, levied or imposed upon the said premises, or any part thereof, during the said term." The term ended on the 30th day of April, 1917, at twelve o'clock midnight. Taxes for the year 1917 were fixed and levied on the 28th day of March, 1917, although not payable until later. This court said: " The obligation of this defendant was to pay all taxes that might be assessed, levied or imposed against the premises during the term. No escape is possible from the conclusion that the taxes for the year 1917 were finally and unalterably fixed and imposed against the demised premises during the term of the lease, although not payable until after the expiration of such term."

Reading these cases, it is well to bear in mind that the court was dealing with the terms of a contract made by the parties. That is what we are now doing in this case. We are holding that the words " levied and imposed " prior to September 1, 1922, applied to the completion of the assessment on August first, when the tax rolls were delivered to the city clerk, and not to the delivery of the tax roll with the warrant for collection to the city

treasurer on November 15, 1922; in other words, that the levy was complete on August first.

The case of *Coudert* v. *Huerstel* (60 App. Div. 83) was dealing with the question of liens, and not the interpretation of a contract. *Ogden* v. *Getty* (100 App. Div. 430) is not unlike *Wall* v. *Hess* (*supra*), and is cited in the opinion in that case. The fact that the tax rolls were delivered to the receiver of taxes with the proper warrant annexed for collection prior to the expiration of the lease was not the determining point. It was only another fact showing that the taxes had been assessed and imposed during the term. *Apex Leasing Co., Inc.,* v. *White Enamel Refrigerator Co.* (202 App. Div. 354) followed our decision in *Wall* v. *Hess* (*supra*).

For these reasons the judgment of the Appellate Division should be reversed, and that of the Special Term affirmed, with costs in this court and in the Appellate Division.

HISCOCK, Ch. J., CARDOZO, POUND, McLAUGHLIN, ANDREWS and LEHMAN, JJ., concur.

Judgment accordingly.